**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-24-02938-001-TUC-RM (BGM) |
| Plaintiff, | **ORDER** |
| v. | |
| Jose Eduardo Ramirez-Nava, | |
| Defendant. | |

Pending before the Court is Defendant Jose Eduardo Ramirez-Nava's Amended Motion to Suppress ("Motion to Suppress"). (Doc. 43.) The Government responded in opposition to the Motion (Doc. 51), and the Court held a hearing on the matter on January 21, 2025 (Docs. 55, 59). For the following reasons, the Court will grant Defendant's Motion to Suppress.

**I.     Background**[1]

Agent Dakota Araujo has been a United States Border Patrol agent for approximately four years and has received training on alien smuggling. (Doc. 59 at 11-12.) He has been assigned to the Douglas Border Patrol Station for the entirety of his time with the Border Patrol. (*Id.* at 12.) He has been involved in approximately 15-20 alien smuggling arrests in the Douglas area. (*Id.* at 13.)

On May 1, 2024, Agent Araujo was on duty in the Douglas, Arizona area, working the midnight shift. (*Id.*) At the pre-shift muster, he was informed that a group of suspected

---

[1] This factual summary is based on the parties' briefs (Docs. 43, 51) and the testimony presented at the suppression hearing (Doc. 59).

1 undocumented aliens had been detected but not apprehended in the "far-east" region of the
2 Douglas area of responsibility. (*Id.* at 14-15, 18.) This "far-east" region is a rural area near
3 the United States-Mexico border. (*Id.* at 15-16.) It can be accessed via Highway 80, which
4 runs east to west and intersects with Highway 191. (*Id.* at 15-16.) Highway 191 provides
5 a direct route north from Douglas to Interstate 10 and includes a Border Patrol checkpoint.
6 (*Id.* at 16.) At the pre-shift muster, Agent Araujo learned that the checkpoint was closed
7 that night, which meant smugglers could take a direct route from Highway 191 to Interstate
8 10 instead of trying to circumnavigate the checkpoint. (*Id.* at 16-18.)

9 After the pre-shift muster, a supervisory agent informed Agent Araujo that a gray
10 Nissan SUV had been seen traveling eastbound along Highway 80, in the general vicinity
11 of the suspected unapprehended group of aliens. (*Id.* at 18-19.) The fact that the vehicle
12 was an SUV was significant to Agent Araujo because smugglers often use SUVs due to
13 their higher passenger capacity. (*Id.* at 19.)

14 While on patrol, Agent Araujo observed a gray Nissan SUV traveling westbound
15 on Highway 80. (*Id.* at 21.) He followed the vehicle to confirm whether it was the same
16 Nissan SUV that he had been advised of as traveling eastbound earlier. (*Id.* at 22.) Agent
17 Araujo noticed that the driver increased his speed and later abruptly turned onto Highway
18 191. (*Id.* at 22-23.) While on Highway 191, the vehicle's speed fluctuated, which Agent
19 Araujo interpreted as a sign that the driver was distracted. (*Id.* at 23-24.) In addition, the
20 vehicle moved to the right lane at one point before returning to its original lane, which
21 Agent Araujo interpreted as an attempt to get him to pass. (*Id.* at 28-29.)

22 The SUV had a Lyft rideshare sticker, but it lacked an illuminated Lyft placard. (*Id.*
23 at 25-27.) Agent Araujo had never seen a Lyft vehicle in Douglas in his years of service
24 as a Border Patrol agent. (*Id.* at 25.) Through the SUV's untinted windows, Agent Araujo
25 saw the driver of the vehicle using a mounted cell phone with a navigation application,
26 while the passengers sat rigid and motionless. (*Id.* at 25, 27-28.) The vehicle's registration
27 indicated it was a rental car. (*Id.* at 24-25.) This fact was significant to Agent Araujo, as
28 he had found in his experience that smugglers often use rental cars to avoid the risk of

1  having their personal vehicles seized by law enforcement.  (*Id.* at 25.)

2  Based on these observations, Agent Araujo initiated a stop of the SUV at 10:48 p.m. (*Id.* at 29-30.)  During the stop, which occurred without incident, Agent Araujo determined that the driver, Defendant, was a United States citizen, and the passengers were undocumented individuals without legal status in the United States.  (*Id.* at 31; Doc. 51 at 5-6.)  Defendant has been indicted on one count of Conspiracy to Transport Illegal Aliens for Profit and two counts of Transportation of Illegal Aliens for Profit.  (Doc. 22.)

**II.     Legal Standard**

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968) and *United States v. Cortez*, 449 U.S. 411, 417 (1981)).  Border Patrol agents may perform a brief investigatory stop so long as it is "supported by reasonable suspicion to believe that criminal activity may be afoot."  *United States v. Raygoza-Garcia*, 902 F.3d 994, 999 (9th Cir. 2018); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country").

"Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct."  *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal quotations omitted).  The district court's reasonable suspicion analysis must be assessed based on the "totality of the circumstances."  *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).  To develop reasonable suspicion, an officer may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal

1 quotations omitted).

2 In the context of stops made near the border, the Supreme Court has outlined factors to consider in determining whether reasonable suspicion existed, including the (1) characteristics of the area; (2) proximity to the border; (3) typical traffic patterns; (4) the officer's prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive behavior; (7) vehicle characteristics; and (8) behavior of people in the car. *Brignoni-Ponce*, 422 U.S. at 884–85.

8 The exclusionary rule mandates that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974) (citing *Mapp v. Ohio*, 367 U.S. 643, 654 (1961)). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)).

13 **III. Discussion**

14 Defendant moves to suppress all evidence obtained from him and his vehicle, as well as any statements made by him, on the grounds that such evidence was obtained as a result of an unlawful stop and detention in violation of the Fourth Amendment. (Doc. 43.) Defendant argues that Agent Araujo lacked specific, articulable facts and rational inferences to support a reasonable suspicion that the vehicle which Defendant was driving contained individuals unlawfully in the country. (*Id.*) Furthermore, Defendant asserts that Agent Araujo's reliance on broad generalizations improperly casts suspicion on large numbers of law-abiding drivers. (*Id.* at 5-6.)

22 The Government contends that Agent Araujo had reasonable suspicion to stop Defendant's vehicle based on the totality of the circumstances, including Agent Araujo's training and experience. (Doc. 51.) The Government specifically emphasizes that Defendant was traveling late at night in a remote area near the border known for smuggling activity. (*Id.* at 8.) The subject vehicle was an SUV, which smugglers use for their higher passenger capacity, and it was traveling while the immigration checkpoint was closed. (*Id.* at 8-9.) Additionally, the vehicle was sighted traveling to and from a general location

1  where a group of suspected undocumented individuals had reportedly been seen.  (*Id.* at 8.)
2  Agent Araujo also noted fluctuations in speed, the driver's use of a navigation application,
3  and passengers sitting rigidly, all of which he interpreted as suspicious.  (*Id.*)  Finally, the
4  Government emphasizes that the vehicle had a Lyft decal, which is unusual in the Douglas
5  area, and that it was a rental car, which smugglers often employ to avoid using their
6  personal vehicles.  (*Id.*)

7  When viewed in their totality, the factors cited by Agent Araujo lack specificity, are
8  largely innocuous, and offer little probative value.  To begin, Agent Araujo's reports
9  provide no indication of what time or where the SUV was initially observed while traveling
10 eastbound on Highway 80, an expansive route stretching from Douglas to the New Mexico
11 border.  (Doc. 59 at 44-46.)  Without this critical information, it is impossible to determine
12 whether the vehicle was near any legitimate destinations, including, for example, two
13 residential housing developments located in the area.  (*See id.* at 47-48.)  The Government's
14 reliance on the outstanding group of suspected undocumented individuals is similarly
15 unfounded.  Agent Araujo provided no specific details about the group, including when or
16 where they were seen, and he offered no evidence linking the group to the subject vehicle.
17 Agent Araujo's suggestion that the SUV may have been connected to the outstanding group
18 lacks any factual basis and is purely speculative.

19 The driving behaviors observed by the agent—slight fluctuations in speed, a lane
20 change, and a last-minute turn—do not rise to the level of evasive or suspicious conduct.
21 While Agent Araujo described the driver's turn onto Highway 191 as abrupt, he admitted
22 that his report contained no observations of evasive behavior, nor did the driver attempt to
23 speed up or evade him.  (*Id.* at 56-67.)  The use of a navigation application and Agent
24 Araujo's description of the passengers sitting still are also innocuous behaviors.  GPS use
25 is common amongst local and non-local drivers, and defense counsel established that Lyft
26 drivers *must* use a mapping application while working.  (*Id.* at 62.)

27 The Government also emphasizes the Lyft decal and the lack of an illuminated Lyft
28 placard as suspicious factors.  However, Agent Araujo's assumption that Lyft requires

illuminated placards was purely speculative and not based on objective facts. (*See id.* at 41 (in which Agent Araujo confirms it was "news to [him]" to learn that the illuminated placards are provided only to drivers who meet specific criteria).) Agent Araujo's belief that Lyft does not operate in Douglas, based solely on his limited observations, also lacks evidentiary support. Furthermore, the vehicle's rental status does not significantly contribute to reasonable suspicion. Although smugglers may use rental vehicles, Agent Araujo admitted that the mere fact that a vehicle is rented is not inherently suspicious. (*Id.* at 56.) Furthermore, the agent's testimony that the SUV's high passenger capacity was consistent with smuggling operations was significantly undermined by his inability to confirm whether the vehicle, a "mini SUV," had more space than a sedan. (*Id.* at 49-50.)

Given these circumstances, the area's proximity to the border and its association with smuggling activity are of little probative value. Many lawful travelers, including thousands of residents in Douglas, use state Route 80 and Highway 191. As the Supreme Court has cautioned, "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well." *Brignoni-Ponce*, 422 U.S. at 882. Thus, "[t]o approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.*; *see also Montero-Camargo*, 208 F.3d at 1138 ("an individual's presence in a high crime area is *not* enough to support reasonable, particularized suspicion that the individual in question has committed or is about to commit a crime").

Based on the totality of the circumstances, the Court concludes that Agent Araujo lacked specific and articulable facts to establish the requisite reasonable suspicion to stop Defendant. *See Thomas*, 211 F.3d at 1192 ("A hunch may provide the basis for solid police work; it may trigger an investigation that uncovers facts that establish reasonable suspicion, probable cause, or even grounds for a conviction. A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment

intrusion."). Because Agent Araujo lacked reasonable suspicion to stop Defendant's vehicle, suppression of all evidence obtained from Defendant and his vehicle, as well as any statements made by Defendant, is warranted. Accordingly, Defendant's Motion to Suppress will be granted.

**IT IS ORDERED** that Defendant's Amended Motion to Suppress (Doc. 43) is **granted**.

Dated this 24th day of January, 2025.

_____
Honorable Rosemary Márquez
United States District Judge